IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
**Honorable A. Bruce Campbell**

| | |
|---|---|
| In re: )| |
| ) | |
| TERRY KENNETH VICKERY, )| Case No. 10-41118 ABC |
| ) | Chapter 7 |
| Debtor. )| |
| _____ )| |
| ) | |
| RICHARD K. DIAMOND, as Chapter 7 )| |
| Trustee for IVDS Interactive Acquisition )| |
| Partners, a Florida general partnership, )| |
| ) | |
| Plaintiff, )| |
| ) | |
| v. )| Adversary No. 11-01164 ABC |
| ) | |
| TERRY KENNETH VICKERY )| |
| ) | |
| Defendant. )| |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Plaintiff's Motion for Summary Judgment, filed on July 15, 2011, Defendant's Response, filed August 2, 2011, and Plaintiff's Reply, filed August 19, 2011.

**I.    BACKGROUND**

Defendant Terry Kenneth Vickery ("Vickery") filed his petition under Chapter 7 of the Bankruptcy Code on December 14, 2010. Plaintiff Richard K. Diamond ("Diamond"), as Chapter 7 Trustee for IVDS Interactive Acquisition Partners, a Florida general partnership ("IVDS"), filed this adversary proceeding seeking a determination that a judgment entered against Vickery in an adversary proceeding brought by Diamond, on behalf of IVDS, against Vickery in the U.S. Bankruptcy Court for the Central District of California ("IVDS Adversary Proceeding"), is nondischargeable under 11 U.S.C. § 523(a)(2), (4), and/or (6).

The final judgment entered in the IVDS Adversary Proceeding was domesticated in the District Court for Jefferson County, Colorado, by a Notice of Filing of Foreign Judgment on February 10, 2009. (*See* Pl.'s Mem. in Support of Mot. for Summ. J. [hereinafter "Pl.'s Mem."] Ex. I.) To collect the Final Judgment, Diamond initiated a proceeding in the Jefferson County

-1-

District Court, pursuant to which the court entered an Order making a number of factual findings.

Diamond's Motion for Summary Judgment is predicated entirely on the law of preclusion, in that Diamond asserts that the facts established in the IVDS Adversary Proceeding and the Jefferson County Proceeding establish the nondischargeability of the judgment debt.

Vickery does not dispute any of the underlying facts asserted by Diamond. However, Vickery contends that there are genuine issues of material fact as to whether or not he engaged in conduct which can result in the IVDS judgment being nondischargeable in his Chapter 7 bankruptcy case. Further, Vickery disputes that the findings made by the Jefferson County District Court are "final" for purposes of issue preclusion.

Because Vickery does not dispute the facts as stated by Diamond, the following summary of facts is based primarily upon Diamond's memorandum and the exhibits submitted in support of his motion.

## II.  IVDS ADVERSARY PROCEEDING

On December 1, 1995, IVDS filed a voluntary petition for relief under Chapter 11 in the U.S. Bankruptcy Court for the Central District of California.  (Pl.'s Mem., Ex. A.)  Diamond was appointed Chapter 11 Trustee.  (Pl.'s Mem., Ex. A.)  The case was subsequently converted to a proceeding under Chapter 7, and Diamond was appointed Chapter 7 Trustee.  (Pl.'s Mem., Ex. A.)

To commence the IVDS Adversary Proceeding, Diamond filed a Complaint to Avoid Fraudulent Transfers on November 24, 1997, seeking to recover $3.6 million in fraudulent transfers made by IVDS pre-bankruptcy.  In the Complaint, Diamond named Vickery and others as defendants, and alleged that Vickery, among others, conspired to form and control IVDS. Diamond further asserted in the Complaint that Vickery and the other defendants did so with the intent to use their control to cause IVDS to transfer to or for their benefit $3.6 million, and that they intended to, and did, raise those funds from over 640 third-party individual investors by means of telemarketing. (Pl.'s Mem., Ex. B .)  On October 16, 2000, the IVDS Adversary Proceeding was transferred to the U.S. District Court for the Central District of California ("U.S. District Court") for a trial by jury.  (Pl.'s Mem., Ex. C.)

### A.  Claims

At trial, Diamond claimed that he was entitled to avoid transfers in the total amount of $3.6 million to the Defendants ("Subject Transfers") pursuant to 11 U.S.C. § 544 because such transfers were voidable under Florida law.  The Trustee sought to recover the $3.6 million from the defendants, claiming that they were jointly and severally liable as conspirators.  (Pl.'s Mem. Ex. E, Apr. 12, 2007 Tr. at 74:16-76:13, 83:16-84:4.)

In the First Claim for Relief, Diamond sought recovery of the Subject Transfers under section 726.105 of the Florida Uniform Fraudulent Transfer Act ("FUFTA").  This claim required him to prove that the Subject Transfers were made to the Defendants by IVDS, with actual intent to hinder delay, or defraud creditors of IVDS.  In the Pretrial Order, the Trustee asserted that actual intent to defraud would be shown through a number of badges of fraud;[1]  he made no mention of how actual intent to hinder or delay would be shown.  (Mot. Summ J. Ex D at 10-11.)

In the Second Claim for Relief, Diamond sought to recover fraudulent transfers under section 726.106(1) of FUFTA, based upon evidence that IVDS did not receive adequate consideration for the Subject Transfers and that IVDS' assets were unreasonably small in relation to what was required to satisfy its obligations to the FCC and to exploit the IVDS licenses or to satisfy rescission claims of investors.  (Pl.'s Mem. Ex. D at 12.)

In the Third Claim for Relief, Diamond sought to recover fraudulent transfers under section 726.105(1)(b) of FUFTA on the grounds that IVDS did not receive adequate consideration for the Subject Transfers and that, at the time of the Subject Transfers, IVDS intended to incur, or  believed or reasonably should have believed that IVDS would incur, debts beyond its ability to pay such debts as they became due.  (Pl.'s Mem. Ex. D at 13.)

The jury returned its verdict on April 13, 2007, finding in favor of Diamond and against all the Defendants, including Vickery, on all three claims for relief (Pl.'s Mem. Ex. E; Ex. D, Apr. 13, 2007 Tr. at 4-9.)

**B.    Stipulations**

The parties stipulated to the following facts, among others,[2] in the U.S. District Court:

1.    The IVDS Complaint originally named Digital Interactive Associates, Inc. ("DIA"), Market Dynamics Group, Inc., Market Logistics Group, Inc., Vickery, David Dambro, Michael Dambro, Douglas Mallach, Perry West ("West"), Lee M. Payne ("Payne"), Vikki Lucas, individually, and as the personal representative of Carlo Anneke, deceased, as defendants (collectively, "Defendants").  (Pl.'s Mem.,  Ex. D at 3 ¶ 5.5; Ex. E, Apr. 4, 2007 Tr. at 26:19-25.)

2.    IVDS was formed on or about April 15, 1994, as a general partnership under the laws of the State of Florida. (Pl.'s Mem., Ex. D at 4 ¶ 6.1; Ex. E, Apr. 4, 2007 Tr. at 29:10-11.)

3.    IVDS' stated business purpose was to acquire and exploit a "specialized radio system" under Interactive Video and Data Services Licenses to be issued by the Federal

---

[1]  These are recited on pages 11 and 12 of the Pretrial Order in the IVDS Adversary Proceeding.  (Pl.'s Mem. Ex. D.)

[2]  The Court has omitted from its summary some stipulated facts that are not relevant to this case.

-3-

Communications Commission ("FCC").  (Pl.'s Mem., Ex. D at 4 ¶ 6.2; Ex. E, Apr. 4, 2007 Tr. at 29:12-15.)

     4.     As of April 15, 1994, no one had invested any money to purchase ownership interests in IVDS. (Pl.'s Mem., Ex. D at 5 ¶ 6.10; Ex. E, Apr. 4, 2007 Tr. at 30:2-3.)

     5.     DIA was incorporated by West on April 7, 1994.  David Dambro selected and retained West to incorporate DIA. (Pl.'s Mem., Ex. D at 4-5 ¶¶ 6.3, 6.7; Ex. E, Apr. 4, 2007 Tr. at 29:16-17; Ex. E, Apr. 4, 2007 Tr. at 29:22-23.)

     6.     David Dambro selected Vickery as the president and sole shareholder of DIA. (Pl.'s Mem. Ex. D at 5 ¶ 6.8; Ex. E, Apr. 4, 2007 Tr. at 29:24-25.)

     7.     On April 15, 1994, IVDS awarded DIA the exclusive right to raise $6 million on behalf of IVDS. (Pl.'s Mem. Ex. D at 5 ¶ 6.12; Ex. E, Apr. 4, 2007 Tr. at 30:6-20.)

     8.     On or about April 15, 1994, IVDS agreed that DIA would be paid sixty percent of the $6 million to be raised by DIA for IVDS, regardless of the expenses DIA actually incurred to raise the $6 million.  (Pl.'s Mem. Ex. D at 5 ¶¶ 6.13, 6.15; Ex. E, Apr. 4, 2007 Tr. at 31: 2-4.)

     9.     IVDS' Partnership Agreement did not disclose that a total of $6 million would be raised from IVDS' investors. (Pl.'s Mem. Ex. D at 6 ¶ 6.24; Ex. E, Apr. 4 2007 Tr. at 32:5-7.)

     10.     Beginning in or around April of 1994, David Dambro had DIA retain Market Logistics Group, Inc. ("MLG") to help solicit potential investors in IVDS.  (Pl.'s Mem. Ex. D at 6 ¶ 6.25; Ex. E, Apr. 4, 2007 Tr. at 32:8-10.).

     11.     MLG was owned and operated by David Dambro's brother, Michael Dambro. The role of MLG was to generate "leads" of potential investors who could be contacted by DIA's telemarketers.  (Pl.'s Mem. Ex. D at 6 ¶¶ 6.26-28; Ex. E, Apr. 4, 2007 Tr. at 32:15-17.)

     12.     MLG obtained these leads by purchasing mailing lists and by mailing an unsolicited promotional "newsletter" called "The Inside Edge" to hundreds of thousands of households throughout the United States.  "The Inside Edge" promoted IVDS as a great investment opportunity and solicited the recipients to either call an "800" telephone number or to return a pre-paid, tear-out card to obtain more information. (Pl.'s Mem. Ex. D at 6 ¶¶ 6.29, 6.31; Ex. E, Apr. 4, 2007 Tr. at 32:17-33:3.)

     13. Market Dynamics Group, Inc. ("MDG") was a corporation wholly owned and operated by David Dambro.  MDG was retained by DIA to assist DIA with its sales presentations. (Pl.'s Mem. Ex. D at 6-7 ¶¶ 6.35-36; Ex. E, Apr. 4, 2007 Tr. at 33:11-14.)

     14.     On July 28, 1994, Carlo Anneke, Payne, West, and David Dambro attended the FCC's license auction ("Auction").  At the Auction, IVDS purchased three FCC Licenses for

-4-

three separate broadcast areas, for a purchase price of $6 million, to be paid over a period of five years. (Pl.'s Mem. Ex. D at 7 ¶¶ 6.38-39; Ex. E, Apr. 4, 2007 Tr. at 33:18-24.)

15.     Shortly after the Auction, IVDS paid the FCC an initial down payment of $1.2 million, leaving IVDS with an obligation to pay the FCC an additional $4.8 million in principal, along with interest, payable over time according to payment schedules established by the FCC, as well as other charges in connection with the purchase of the FCC Licenses.  (Pl.'s Mem. Ex. D at 7, ¶ 6.40; Ex. E, Apr. 4, 2007 Tr. at 33:25-34:6.)

16.     According to IVDS' accountants, BDO Seidman, "expenses" paid on behalf of IVDS for the year ended 1994 amounted to $3,561,729.24 (the "Subject Transfers."). (Pl.'s Mem. Ex. D at 7 ¶ 6.42; Ex. E, Apr. 4, 2007 Tr. at 34:9-12.)

17.     About 640 investors invested money in IVDS. (Pl.'s Mem. Ex. D at 7 ¶ 6.45; Ex. E, Apr. 4, 2007 Tr. at 34:20-21.)

18.     Investors in IVDS were required to invest a minimum of $6,000.  (Pl.'s Mem. Ex. D at 7, ¶ 6.44; Ex. E Apr. 4, 2007 Tr. at 34:18-19.)

19.     David Dambro was a signatory on one of DIA's bank accounts.  (Pl.'s Mem. Ex. D at 7 ¶ 6.48; Ex. E, Apr. 4, 2007 Tr. at 35:1-2.)

20.     On IVDS' tax return for the 1994 fiscal year end, IVDS reported that it had paid approximately $3,085,961 of syndication costs.  (Pl.'s Mem. Ex. D at 8 ¶ 6.49; Ex. E, Apr. 4, 2007 Tr. at 35: 3-5.)

The parties also stipulated that DIA personnel used scripts approved and prepared by Vickery and other defendants, and that Vickery trained DIA telemarketers.  (Pl.'s Mem. Ex. D at 6 ¶¶ 6.34, 6.35; Ex. E, Apr. 4, 2007 Tr. at 31:7-10.)

### B.     Verdict

An almost two-week-long jury trial was held in the IVDS Adversary Proceeding.  (Pl.'s Mem. Ex. E.)  In the proceeding, Diamond asserted three claims against the defendants, including Vickery,[3] and further asserted that the defendants' actions in the case were part of a conspiracy by the defendants to have IVDS make fraudulent transfers to them or for their benefit.  (Pl.'s Mem. Ex. D at 10-13 and Ex. E, Apr. 12, 2007 Tr. at 82-83.)  Vickery participated in the trial.  (Pl.'s Mem. Ex. E.)

For the first claim for relief, that "[IVDS] made a transfer or incurred an obligation with the actual intent to hinder, delay, or defraud any creditor of [IVDS]," in response to the question,

_____

[3] Diamond withdrew two additional claims for relief, also seeking recovery of fraudulent transfers, at the start of trial.  (Pl.'s Mem. at 9 n.3.)

"Do you the jury . . . unanimously find in favor of the Plaintiff Richard K. Diamond as Chapter 7 trustee for the bankruptcy estate of [IVDS] and against defendants?," the jurors answered, "Yes" as to Terry Vickery.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 4:16-5:2.)  Further, the jury answered, "Yes" as to Terry Vickery in response to "We the jury unanimously find that the defendants' action in this case were part of a conspiracy to have [IVDS] make fraudulent transfers to them or for their benefit."  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 5:6-12.)  The jury assessed actual and compensatory damages on this claim against Vickery and in favor of Diamond in the amount of $400,000.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 5:16-21.)  The jury also assessed a total of $1,040,000 in actual and compensatory damages against other defendants.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 5:16-24.)

For the second claim for relief, that "[IVDS] made a transfer or incurred an obligation one, without receiving an equivalent value in exchange for the transfer or obligation and two, was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," in response to the question, "Do you the jury. . .  unanimously find in favor of Plaintiff Richard K. Diamond as Chapter 7 trustee for the bankruptcy estate of [IVDS] and against defendants?," the jurors answered "Yes" as to Terry Vickery.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 5:25-6:13.)  Further, the jury answered "Yes" as to Terry Vickery in response to "We the jury unanimously find that the defendants' actions within this case were part of a conspiracy by the defendants to have the debtor make fraudulent transfers to them or for their benefit." (Pl.'s Mem. Ex.  E, Apr. 13, 2007 Tr. at 5:61-12.)  The jury assessed actual and compensatory damages on this claim against Vickery and in favor of Diamond in the amount of $300,000.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 7:2-7.)  The jury also assessed a total of $780,000 in actual and compensatory damages against other defendants.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 7:2-10.)

On the third claim for relief, that "[IVDS] made a transfer or incurred an obligation one, without receiving an equivalent value in exchange for the transfer or obligation and two, intended to incur or believed or reasonably should have believed that he or she would have incurred debts beyond his or [sic] ability to pay as they became due," the jury responded, "Yes," to the statement,  "We the jury . . . unanimous[ly] find in favor of Plaintiff Richard K. Diamond as the Chapter 7 trustee for the bankruptcy estate of [IVDS] and against defendant[] . . . Terry Vickery."  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. 7:11-23.)  Further, the jury answered "Yes" as to Terry Vickery in response to "We the jury unanimously find that the defendants' actions within this case were part of a conspiracy by the defendants to have the debtor make fraudulent transfers to them or for their benefit." (Pl.'s Mem. Ex. 5 Apr. 13 Tr. at 8:2-8.)  The jury assessed actual and compensatory damages on this claim against Vickery and in favor of Diamond in the amount of $300,000.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 8:12-17.)  It also assessed a total of $780,000 in actual and compensatory damages against other defendants.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 8:12-20.)

The jury answered "Yes," when asked whether Terry Vickery acted maliciously; "Yes," when asked whether Terry Vickery acted oppressively; and "Yes" when asked whether Terry Vickery acted in reckless disregard of plaintiff's rights.  (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at

8:21-9:15.)

In addition to the awards for actual and compensatory damages, the jury unanimously found that punitive damages should be awarded against Vickery and in favor of Diamond. The jurors determined that the appropriate amount of punitive damages was $1 million. (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 44:9-22.) It also entered punitive damages awards in the total amount of $2.5 million against two other defendants. (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 44:15-22.)

### C.    Judgment

The U.S. District Court entered judgment against Vickery, ordering, adjudging, and decreeing as follows:

> Plaintiff, Richard K. Diamond, as Trustee, recover from the Defendant and co-conspirator, TERRY K. VICKERY, the sum of $3,600,000, pursuant to the applicable legal principles of joint and several liability, as actual damages, plus the additional sum of $1,000,000 as punitive damages from the Defendant Terry K. Vickery, individually. . . .

(Pl.'s Mem. Ex. F at 2.)

Diamond states that the verdict and judgment were based on certain other facts that were "established at trial," citing the Pretrial Order, in which he identified the badges of fraud that he contended showed the actual intent of the defendants in the IVDS Adversary Proceeding to defraud investors. (Pl.'s Mem. at 11-12.) Whether those facts were, indeed, "established," is one of the central questions that this Court must determine in deciding this summary judgment motion.

## III.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056. A party asserting that a fact cannot be genuinely disputed must support that assertion by "citing to particular parts of the record, including depositions, documents, . . . affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.* 475 U.S. 574, 106 S.Ct. 1348 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288 (10th Cir. 1991). The movant bears the initial burden of establishing that summary judgment is appropriate. *Whitesel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

-7-

IV.    **PRECLUSIVE EFFECT OF THE JUDGMENT IN THE IVDS ADVERSARY PROCEEDING**

Collateral estoppel (issue preclusion) precludes relitigation of an issue that was litigated and decided in a previous proceeding.  It is a doctrine designed to promote the fundamental policies of finality, economy, consistency, and comity in the judicial process.  *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 466 n.6, 102 S.Ct. 1883, 1890 n.6 (1982).  Doctrines of preclusion find their roots early in this country's history, in Article IV of the United States Constitution, and in the "Full Faith and Credit Act," which was first enacted in 1790.  28 U.S.C. § 1738.  Generally, collateral estoppel precludes parties to a previous action from relitigating issues of fact or law actually litigated and determined by a valid and final judgment. RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982).  In *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654 (1991), the Supreme Court made clear that, in determining the dischargeability of a creditor's claim, a bankruptcy court may properly give collateral estoppel effect to those elements of a claim of non-dischargeability that are identical to elements which were actually determined in a prior action.  498 U.S. at 284.

Rules for application of preclusion principles are determined by the law of the forum in which the prior judgment was rendered.  *Marrese v. American Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1332 (1985).  Thus, a judgment is afforded the same preclusive effect in a subsequent action brought in a different forum that it would be afforded if the latter action were brought in the original forum.  Under *Marrese*, "the law of the forum in which the prior judgment was rendered" must be applied to determine the preclusive effect of the judgment.  470 U.S. at 380.  In this case, with respect to the judgment in the IVDS Adversary Proceeding, the law of collateral estoppel of the U.S. District Court for the Central District of California (including the law of the Ninth Circuit Court of Appeals and U.S. Supreme Court), applies.

In the Ninth Circuit, "collateral estoppel applies only where it is established that (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding."  *Hydranautics v. Filmtec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000).

In this case, there is no dispute that the first proceeding in the Central District of California ended with a final judgment on the merits.  It is also undisputed that Vickery was a party in the first proceeding.  The question, then, is whether the issues determined by in the IVDS Adversary Proceeding were (a) necessarily decided and (b) identical to the elements that Diamond must establish in order to prove his claims under § 523(a)(2), (4) and (6).

With respect to this, the Ninth Circuit has noted,

When determining the preclusive effect of a jury verdict, we must "examine the record of [the] prior proceeding, taking into account the pleadings, evidence,

-8-

charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe* [*v. Swenson*, 397 U.S. 436, 444, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)] (internal quotation marks omitted). If "there is more than one rational conclusion that can be drawn from the first jury's verdict," then collateral estoppel cannot apply because the issue was not necessarily decided by the jury's verdict. *Santamaria v. Horsley*, 133 F.3d 1242, 1246 (9th Cir.1998) (en banc). "The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" *Ashe*, 397 U.S. at 444 (quoting *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 92 L.Ed. 180 (1948)).

*Sivak v. Hardison*, --- F.3d ---, Case No. 08-99006, 2011 WL 3907111 (9th Cir. Sept. 7 2011). Thus, "a judgment based on a general verdict in an action wherein a determination of any one of several issues may have been the basis for that verdict, does not authorize the application of the doctrine of estoppel by judgment to such issues in a subsequent action under circumstances where . . . it is necessary to identify the specific issue determined in the former action." *Stout v. Pearson*, 180 Cal. 211, 216 (1960), *cited with approval*, *McNair v. Jones (In re Jones)*, 182 F.3d 925, 1999 WL 376800 at *1 (9th Cir. 1999)(unpublished opinion).

Where two or more alternative findings are each independently sufficient to support the ultimate judgment, the Ninth Circuit follows the view that each of the alternative findings is entitled to preclusive effect in a later case. *In re Westgate-California Corp.*, 642 F.2d 1174, 1176-77 (9th Cir. 1981); see also *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 251-52 (3d Cir. 2006)(collecting cases on both sides of this issue).

## A.   Claim under Section 523(a)(2)(A)

Pursuant to § 523(a)(2)(A) a debtor will not be discharged from any debt "for money, property, or services . . . to the extent obtained by – (A) false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A).

In this case, Diamond asserts that the findings made in the case in the U.S. District Court are sufficient to establish that Vickery's debt to IVDS[4] is nondischargeable because it was obtained by false pretenses, false representations, *and* actual fraud.[5]

### 1.   False Representations or Actual Fraud

---

[4] The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). In this case, Vickery has a debt to IVDS's bankruptcy estate arising from the judgment entered against him in the U.S. District Court for the Central District of California.

[5] Though Diamond only needs to show that the debt was obtained by one of the three of false representations, false pretenses, or fraud, he asserts that the judgment establishes all three.

With respect to a nondischargeability claim predicated on false representation or actual fraud, a plaintiff must establish the following elements: (1) the defendant made a false representation; (2) the defendant made the representation with the intent to deceive the plaintiff; (3) the plaintiff relied on that representation; (4) the plaintiff's reliance as reasonable; (5) the debtor's representation caused the creditor to sustain a loss. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996). The creditor bears the burden of proving all elements of a claim under § 523(a)(2)(A). *Grogan*, 498 U.S. at 287.

Diamond contends that the jury, having considered the evidence regarding "Vickery's actions in setting up the involved entities, the methods by which he misled individuals into investing in IVDS, his operation of the entitles in such a way that prevented IVDS from being financially viable, and the wrongful transfer of IVDS assets to Vickery and the other defendants, "found that Vickery's acts were done with intent to defraud IVDS and its creditors." (Pl.'s Mem. at 23.) This is not, however, necessarily the case. On the first claim for relief in the IVDS Adversary Proceeding, the verdict indicated that IVDS "made a transfer or incurred an obligation with the actual intent to hinder, delay, *or* defraud any creditor of [IVDS]." (Pl.'s Mem. Ex. E, Apr. 13, 2007 Tr. at 4:16-5:2 (emphasis added).) Thus, the jury did not *necessarily* decide the question of whether IVDS acted with intent to defraud. Indeed, it may well have grounded its verdict on a finding that IVDS acted with intent to hinder, or intent to delay, without ever reaching the question of whether he IVDS acted with intent to defraud.[6]

Further, though the jury *may* have considered the "badges of fraud" that Diamond identified in the Pretrial Order in reaching its conclusion, the record is devoid of any evidence that the jury agreed with all, or any, of the statements therein. These "badges of fraud," therefore, are not established facts upon which Diamond may rely in support of his claim of nondischargeability predicated upon actual fraud or false representation.

2.   False Pretenses

A claim predicated on "false pretenses," requires a similar but different showing to a claim based on false representation or actual fraud, in that it requires the creditor to prove that the debtor created and fostered in the creditor a false or misleading understanding of the transaction. *Evans v. Dunston (In re Dunston)*, 117 B.R. 632 (Bankr. D. Colo.1990), *aff'd in part and rev'd in part on other grounds*, 146 B.R. 269 (D. Colo. 1992). Such false

---

[6] It is not necessary for Diamond to establish that the debt is the result of Vickery's own fraudulent conduct. It is sufficient to show that the *debt* is a debt for fraud, and that Vickery is liable on it. In *SIPC v. Rounds*, Adv. Pro. No. 09-1220 ABC (Bankr. D. Colo. August 19, 2010), this Court addressed whether a debtor's imputed or vicarious liability for the fraud of another is non-dischargeable under § 523(a)(2)(A). The Court ruled that the matter was controlled by the language of the statute and the Supreme Court's decision in *Strang v. Bradner*, 114 U.S. 555 (1885), and that a debt may be non-dischargeable under § 523(a)(2)(A) without proof that the debtor personally committed the fraud from which the debt arises.

understanding may be created through "a series of events, activities or communications." *Id. See also Taylor v. Wood*, 245 Fed. Appx. 916, 917 (11th Cir. 2007) (providing similar definition).  It may, but does not have to, include a written or express false representation, and may consist of silence when there is a duty to speak. *Id.* To establish that a debt was obtained by false pretenses, the plaintiff must establish: (1) an implied misrepresentation or conduct by the defendant; (2) promoted knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance money, property, or credit to the defendant. *In re Hambley*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005).

Diamond contends that the jury concluded that "Vickery knowingly and willfully engaged in a series of events that created a false and misleading understanding of the circumstances surrounding IVDS and its financial transactions, which wrongfully induced IVDS to transfer funds to the defendants [in the IVDS Adversary Proceeding]." (Pl.'s Mem. at 23.) This, Diamond states, establishes that Vickery's debt is nondischargeable as obtained by false pretenses.

There is no basis in the jury instructions, the verdict, or the judgment that supports Diamond's argument on this point.  As discussed above, the jury's verdict on Diamond's first claim for relief[7] could have been based only on a finding that Vickery participated, in some unspecified way, in a conspiracy to cause IVDS to transfer property with the intent to hinder or delay its creditors.[8]  Such a finding establishes none of the elements of a claim for false pretenses under § 523(a)(2)(A).

**B.      Claim Under Section 523(a)(4)**

Section 523(a)(4) provides a discharge exception for "fraud or defalcation while acting in

---

[7]  The second and third claims for relief in the IVDS Adversary Proceeding were based on constructive, rather than actual, fraud and thus the verdict on these claims has no preclusive effect as to any of the elements of § 523(a)(2)(A).  *See McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000)(holding that fraud is constructive if only evidence of it is inadequacy of consideration and that § 523(a)(2)(A) excludes debts for constructive fraud); *Watson v. Parker (In re Parker)*, 264 B.R. 685, 699 (10th Cir. BAP 2001)("The term 'fraud' as used in § 523(a)(2)(A) means actual or positive fraud rather than fraud implied by law.").

[8]  In the jury's instructions, "conspiracy" was defined as "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose by unlawful means.  Namely, in this case to cause the debtor to fraudulently transfer $3.6 million to or for the benefit of defendants." (Pl.'s Mem. Ex. E, Apr. 12, 2007 Tr. at 82:16-24.)  The instructions further stated, "Each act done in pursuance of a conspiracy by one of several conspirators is an act of which each of the other conspirators is jointly and severally in other words equally liable.  Individual liability attaches to each member of a group that has contributed collectively to a conspiracy. When alleging a collective fraud, therefore. specific allegations about the role of each defendant are unnecessary."  (Pl.'s Mem. Ex.  E, Apr. 12, 2007 Tr. at 82:25-84:6.)

a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).[9]  Here, Diamond asserts that the facts determined in the IVDS Adversary Proceeding are identical to those needed to establish a claim based on embezzlement under § 523(a)(4).  Diamond does not contend that the facts support a claim for nondischargeability for fraud or defalcation while acting in a fiduciary capacity or for larceny.

Embezzlement is a "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir. 1988)(internal quotation omitted).  "This definition breaks down into five elements: 1. Entrustment (property lawfully obtained originally); 2. Of property; 3. Of another; 4. That is misappropriated (used or consumed for a purpose other than that for which it was entrusted); 5. With fraudulent intent." *Bombardier Capital, Inc v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876 (Bankr. D. Colo. 2004)(internal quotation omitted).  Embezzlement, for purposes of 11 U.S.C. § 523, "requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud."  *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986)(internal citation omitted).

Though the jury in the IVDS Adversary Proceeding made a finding that IVDS acted with intent to "hinder, delay, *or* defraud," the jury did not necessarily determine that IVDS acted with intent to defraud.  Accordingly, the stipulated findings and the verdict from the IVDS Adversary Proceeding do not suffice to establish the fifth element of a § 524(a)(4) claim for embezzlement.  Additionally, the verdict and stipulated findings do not establish that the property transferred by IVDS was property of another that had been entrusted to IVDS.  Thus, Diamond has also failed to establish the third element of embezzlement under § 523(a)(4).

### C.    Claim Under Section 523(a)(6)

Under § 523(a)(6), a debtor is denied discharge from liabilities arising out of "willful and malicious injury" by the debtor to another or another's property.[10]  For a debt to become nondischargeable under § 523(a)(6), the debtor "must desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it."  *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (quotation omitted).  Whether the "willful and malicious injury" exception to dischargeability in § 523(a)(6) applies "turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur." *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, 2000 WL 1275614 at *3 (10th Cir. 2000) (unpublished opinion).  Without proof of

---

[9]  As with § 523(a)(2), § 523(a)(4)'s discharge exception focuses on the character of the debt, not the debtor's personal conduct.  Thus, imputed or vicarious liability may support a claim of non-dischargeability under § 523(a)(4).  See footnote 6, *supra*.

[10]  In contrast to §§ 523(a)(2) and (a)(4), a debtor's imputed or vicarious liability is not sufficient to render a debt non-dischargeable under § 523(a)(6) without proof of the debtor's intent to cause injury.  Subsection (a)(6) of § 523 refers to debts for "willful and malicious injury *by the debtor*." (emphasis added) The words "by the debtor" appear in neither § 523(a)(2) or (4).

both willful and malicious injury, an "objection to discharge under [§ 523(a)(6)] must fail." *Moore*, 357 F.3d at 1129.

Here, Diamond's punitive award was supported by specific findings, necessarily made, that Vickery acted maliciously, with reckless disregard, and oppressively. The finding of reckless disregard does not support a finding that Vickery's conduct met the test for willful and malicious injury under § 523(a)(6). In *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974 (1998), the Supreme Court held that "debts arising from recklessly . . . inflicted injuries do not fall within the compass of § 523(a)(6)." 523 U.S. at 61. The finding of "oppressive" conduct by Vickery similarly falls short. The jury was instructed that they could find "an act . . . oppressive if the person who performs . . . it injures or damages or otherwise violates the rights of plaintiff with unnecessary harshness or severity . . . ." (Pl.'s Mem. Ex. E, Apr. 12, 2007 Tr. at 83:16-17)(emphasis added). The fact that Vickery acted with unnecessary harshness or severity does not necessarily mean that Vickery intended any specific injury.

With respect to the definition of malicious, the jury was told that "[c]onduct is malicious if it is accompanied by ill will or spite <u>or</u> if it is for the purpose of injuring another." (Pl.'s Mem. Ex. E, Apr. 12, 2007 Tr. at 83:25-84:4)(emphasis added). Thus, the jury's finding that Vickery acted maliciously could have been based on a finding that Vickery took some action "with spite." This finding does not establish that Vickery intended the injury upon which the verdict was based. Indeed, without anything in the verdict detailing which specific act or acts were done by Vickery in furtherance of the conspiracy, the jury's verdict cannot be used to preclude relitigation of whether Vickery wished to cause injury to IVDS' creditors or whether he believed such injury was substantially certain to occur. Accordingly, Diamond cannot establish at this stage the necessary elements of his claim under § 523(a)(6).

## V.     PUNITIVE DAMAGES

Under *Cohen v. De la Cruz*, 523 U.S. 213,118 S.Ct. 1212 (1998), a debt for money obtained by fraud includes any liability arising from the fraudulent conduct, including punitive damages. *Fox v. Barber (In re Barber)*, 326 B.R. 463, 467 (10th Cir. BAP 2005). *See also Cohen v. de la Cruz ( In re Cohen)*, 106 F.3d 52, 56 (3rd Cir.1997), *aff'd* 523 U.S. 213 (1998) ("Liability under state law for damages caused by fraud, whether punitive or compensatory, clearly represents [such] a debt within the meaning of the bankruptcy code."). The rationale of *Cohen v. de la Cruz* applies equally to debts under §§ 523(a)(4) and (a)(6). As Diamond has failed to show that the IVDS Adversary Proceeding established the elements of any of his § 523(a) claims, the Court cannot determine at this time whether the judgment against Diamond for punitive damages is nondischargeable.

## VI.     PRECLUSIVE EFFECT OF THE JEFFERSON COUNTY DISTRICT COURT JUDGMENT

The Jefferson County District Court entered its Order in supplemental proceedings for collection of the domesticated judgment, in Diamond's favor on September 22, 2010, *nunc pro*

*tunc*, August 4, 2010. (Pl.'s Mem. Ex. K.) On November 10, 2010, the court ordered Vickery to pay attorney's fees, plus interest. (Pl.'s Mem. Ex. L.) Two days later, on November 12, 2010, the court entered an order denying a motion for post-trial relief. (Pl.'s Mem. Ex. M.) On December 1, 2010, Vickery filed a Notice of Appeal in the Colorado Proceeding. (Pl.'s Reply at 9.) He did not post a bond or seek a stay pending appeal. Vickery filed for bankruptcy on December 14, 2010, after which Diamond filed a Suggestion of Bankruptcy advising the Colorado Court of Appeals of the filing. (Pl.'s Reply at 9-10; Ex. N.) The Court of Appeals issued an order on February 4, 2011, staying further proceedings pending further orders of the Bankruptcy Court. The Court of Appeals' order requires Vickery to file a status report within 60 days and every 60 days thereafter until the stay is discharged. (Pl.'s Reply at 10, Ex. O.) Vickery's first status report, therefore, was due to be filed on April 5, 2011.

On April 8, 2011, this Court entered an Order granting Diamond's Motion for Relief from Stay. Therein, the Court ordered that Diamond could proceed with the litigation and with the enforcement of its judgment in the Jefferson County District Court case. The Court noted, however, that the stay remained in effect as to all claims for pre-petition attorneys' fees related to the contempt proceedings in the Jefferson County District Court. Also on April 8, 2011, the Court entered an order granting Vickery's bankruptcy discharge under 11 U.S.C. § 727.

On June 14, 2011, the deputy clerk of the Colorado Court of Appeals sent a letter to Vickery, reminding him of his obligation and advising that he should file a status report on or before June 24, 2011, and every 60 days thereafter until the matter was resolved in the Bankruptcy Court. (Pl.'s Reply Ex. R.) On June 25, 2011, the Court of Appeals issued an Order stating that if a status report was not received within 11 days of the date of the Order, the stay would be lifted and the appeal dismissed for failure to prosecute. (Pl.'s Reply Ex. S.) Thereafter, on July 28, 2011, Vickery filed a letter in the Court of Appeals, stating that "discharge has not been entered and the automatic stay is still in effect." (Pl.'s Reply Ex. T.)

Diamond suggests that the Court should give preclusive effect to the Jefferson County District Court's findings of fact because Vickery has been free to pursue his appeal, but has not availed himself of the opportunity to do so. He also suggests that the Court should treat the findings as final because, once the Court of Appeals is made aware of the Order granting the Motion for Relief from Automatic Stay, there will be no impediment to Vickery's appeal. Diamond states, "This court should not countenance the Catch-22 which Vickery is attempting to create – that this Court cannot treat the Colorado Proceedings as final because of the pending appeal and that the Colorado Court of Appeals cannot proceed with the pending appeal because of the automatic stay." (Pl.'s Reply at 11.) Diamond states that he intends immediately to advise the Court of appeals that a discharge order has entered and that he has received relief from stay to proceed with the case. (Pl.'s Reply at 11.)

In Colorado, for a judgment to be final, it must be "'sufficiently firm' in the sense that it was not tentative, the parties had an opportunity to be heard, and there was an opportunity for review." *Rantz v. Kaufman*, 109 P.3d 132, 141 (Colo. 2005) (quoting *Carpenter v. Young*, 773 P.2d 561, 568 (Colo.1989)). Finality, therefore, requires "an opportunity for review before a

judgment can be considered final . . . .  Pronouncing a judgment to be final while it is still pending on appeal would negate that requirement."  *Id.*  Thus, "for the purposes of issue preclusion, a judgment that is still pending on appeal is not final."  *Id.*

Contrary to Diamond's assertion, because relief from stay has been granted, there is no barrier that prevents the Colorado Court of Appeals from proceeding with the pending appeal. Further, under *Rantz*, until Vickery's appeal is no longer pending, this Court cannot treat the findings in the Jefferson County District Court as final. 109 P.3d at 141.  Accordingly, that court's findings lack preclusive effect under Colorado law and will not be considered by the Court as having been established in the prior proceeding.

## VII.    CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is hereby DENIED as to all claims.

DATED: October 17, 2011.

BY THE COURT:

_____

A. Bruce Campbell, Judge

-15-