IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
**Honorable A. Bruce Campbell**

| | |
|---|---|
| In re: ) | |
| ) | |
| TERRY KENNETH VICKERY, ) | Case No. 10-41118 ABC |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | |
| ) | |
| RICHARD K. DIAMOND, as Chapter 7 ) | |
| Trustee for IVDS Interactive Acquisition ) | |
| Partners, a Florida general partnership, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 11-01164 ABC |
| ) | |
| TERRY KENNETH VICKERY ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RULING

This matter came on for trial on March 19-21, 2012. After the trial, several hundred pages of trial and deposition testimony from prior proceedings that had been admitted in evidence were submitted to the Court. The Court reconvened for counsel's closing arguments on April 30, 2012, and thereafter took the matter under advisement. The Court now makes the following findings of fact, conclusions of law, and ruling.

Plaintiff Richard K. Diamond ("Plaintiff") appears in this action in a representative capacity as Chapter 7 Trustee for IVDS Interactive Acquisition Partners, a Florida general partnership ("IIAP"). Defendant Terry Kenneth Vickery ("Vickery" or "Debtor") is an individual who filed a Chapter 7 petition in this Court on December 14, 2010. IIAP filed bankruptcy in the United States Bankruptcy Court for the Central District of California in 1995. Long before Vickery filed his bankruptcy, Plaintiff sued Vickery in an adversary proceeding related to IIAP's bankruptcy ("IIAP Adversary Proceeding") to avoid certain transfers from IIAP to Vickery and others, and to recover the value of the property transferred. The IIAP Adversary Proceeding culminated in a May, 2007 judgment in favor of Plaintiff and against Vickery and others. Plaintiff's judgment against Vickery is in the amount of $3.6 million in actual damages and $1 million in punitive damages ("IIAP Judgment"). Plaintiff brought this adversary proceeding for a determination that this judgment debt owed by Vickery to Plaintiff as Trustee of the IIAP bankruptcy estate is nondischargeable under 11 U.S.C. § 523(a)(2), (4), and/or (6).

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) and (b) and 28 U.S.C. §§ 157(a) and (b)(1). Adjudication of the claims in this adversary proceeding are core proceedings under 28 U.S.C. § 157(b)(2)(I).

## CLAIMS AND DEFENSES

Plaintiff asserted three claims for relief: first, that the IIAP Judgment should be excepted from Vickery's discharge as a debt for funds obtained "under false pretenses, false representations or actual fraud;" second, as a debt for "fraud and defalcation, while acting in a fiduciary capacity to [IIAP];" and third, as a debt for "willful and malicious injury to [IIAP] and its property." Complaint, ¶¶ 50, 56, and 61.

Vickery generally denied the allegations of Plaintiff's Complaint.

## FINDINGS OF FACT

The undisputed basic facts concerning the formation and operation of IIAP and the proceedings leading to the IIAP Judgment were set forth in detail in this Court's October 17, 2011 Order Denying Plaintiff's Motion for Summary Judgment [Docket # 20] and are incorporated herein. They are summarized below only to the extent necessary to provide background for this ruling.

IIAP was formed, in April, 1994, for the purpose of acquiring licenses to be issued by the Federal Communications Commission ("FCC") which would entitle the license holder to operate an interactive television system within a particular geographic market. IIAP hired a company known as Digital Interactive Associates, Inc. ("DIA") to raise $6 million for IIAP. DIA hired Market Dynamics Group ("MDG") and Market Logistics Group ("MLG") as consultants.

Over the course of eight months from April through December, 1994, $6 million dollars was raised for IIAP from approximately 640 investors who were required to invest a minimum of $6,000. Of this amount, nearly $3.6 million dollars (60%) was paid by IIAP for "expenses" of raising the $6 million. In July, 1994, IIAP purchased three interactive television licenses from the FCC for a total of $6 million dollars with a down payment of $1.2 million and the $4.8 million balance to be paid over five years. A year and a half later, in December, 1995, IIAP filed its Chapter 11 bankruptcy which was subsequently converted to Chapter 7.

Plaintiff brought the IIAP Adversary Proceeding against Vickery and others involved with IIAP, DIA, MDG and MLG. There Plaintiff alleged that $3.6 million had been transferred by IIAP to the defendants and that the transfers were avoidable under Florida law. Plaintiff, as a bankruptcy trustee, was subrogated to IIAP's creditors' avoidance rights by the Bankruptcy Code "strong arm" provisions of 11 U.S.C. § 544.[1] Plaintiff recovered the $3.6 million judgment jointly and severally

---

[1] Plaintiff alleged that the transfers were both actually fraudulent (i.e., that they were made with the intent to hinder, delay, or defraud, creditors of IIAP) and constructively fraudulent

against Vickery and the other defendants, having claimed that they were part of a conspiracy to cause IIAP to transfer the funds.

At the conclusion of a two-week trial, the jury returned a verdict in favor of Plaintiff and against Vickery and other defendants. The jury found that $3.6 million was fraudulently transferred by IIAP. Of the $3.6 million in total transfers, the jury found that $1,440,000 was transferred by IIAP with the intent to hinder, delay, or defraud IIAP's creditors; $1,080,000 was transferred by IIAP without receiving equivalent value in exchange for the transfers when IIAP was engaged in business for which its remaining assets were unreasonably small; and $1,080,000 was transferred by IIAP without receiving equivalent value in exchange while IIAP was unable to pay its debts.

The jury found that Vickery was part of a conspiracy to cause IIAP to make fraudulent transfers. The jury assessed $1,000,000 in actual damages and $1,000,00 in punitive damages against Vickery individually. An additional $2.6 million in actual damages was awarded against defendants other than Vickery. The United States District Court entered judgment against Vickery in the amount of $3.6 million in actual damages, "pursuant to the applicable legal principles of joint and several liability" as a "co-conspirator," plus the $1 million in punitive damages.

The following additional facts regarding the formation and operation of IIAP were established by the evidence presented at the trial of the instant adversary proceeding. IIAP was formed by Carlo Anneke ("Anneke") and David Dambro ("Dambro"). Anneke had experience in the television industry and was known to Dambro to be interested in becoming involved in any projects that Dambro put together regarding interactive television. Anneke acted as the original general partner of IIAP. Although Dambro took no formal ownership interest or managing title with IIAP, Dambro was the catalyst in bringing together all the parties with the expertise needed to raise the funds for IIAP, and he was the person in charge of the venture. Dambro hired attorney Perry West ("West") to draft the legal documents necessary to form the partnership and to give an opinion on whether the sale of the partnership interests would be subject to securities laws and regulations. Doug Mallach ("Mallach") was brought on board by Dambro, nominally as a "consultant" to DIA, but in reality to be in charge of all aspects of DIA's day-to-day operations.

In an April 11, 2004 fax from Dambro to West and Lee Payne [Plaintiff's Exhibit 28], there is a summary of items discussed at an April 10, 2004 meeting concerning the formation of IIAP. The summary includes the total $6 million goal for fund-raising, with the proceeds to be distributed as follows: 40% ($2.4 million) to be put in "escrow" with West for the benefit of IIAP; 20% ($1.2 million) for sales commissions to be paid to sales people and sales managers; 15% ($900,000) to DIA for marketing, and 25% ($1.5 million) for DIA's "G & A" expenses. Dambro, Anneke, and West were involved in formulating the $6 million goal, the $2.4 million "escrow," and the distribution of the balance of funds raised. Six million dollars was the upper limit for IIAP fund-raising because that was the maximum amount a company could have and still qualify, according to FCC regulations, as a small business entitled to special "credits" in the license purchase process. Anneke thought the

---

(i.e., that they were made for inadequate consideration while IIAP was insolvent).

$2.4 million was a reasonable sum for IIAP to acquire some "good" FCC licenses and for some nominal initial operating costs. This funding plan described in the April 11, 2004 fax was approved at the initial partnership meeting where Anneke acted as the initial general partner of IIAP. Dambro and West also attended the initial meeting.

Vickery knew Dambro and Mallach from prior business ventures, and they asked him to become involved with IIAP and DIA. Vickery became president and sole shareholder of DIA at the request of Dambro and/or Mallach. Vickery used money lent to him by Dambro to purchase DIA shares. Dambro and/or Mallach retained the option to acquire Vickery's ownership interest in DIA at any time. Vickery's role with DIA was limited to being in charge of sales operations and supervision of the 30-40 "sales associates" who contacted potential investors by telephone. Vickery drafted sales scripts and trained and supervised the sales people. Though nominally Vickery was president an sole owner of DIA, the corporation was in fact controlled by Dambro and Mallach.

MDG was Dambro's company. He was its president and sole shareholder. During the eight month period in 1994, during which funds were raised for IIAP, Dambro's full time job was "consulting" with all of the parties involved with IIAP. According to Dambro's April, 1999 deposition testimony, MDG had a verbal contract with DIA to contribute Dambro's expertise, consulting, marketing, and support for whatever amount of time was necessary. MDG's compensation was to be a flat fee of whatever was "left over" after the escrow of $2.4 million for IIAP and the payment of all the other expenses of raising the funds.

MLG was a company owned by Michael Dambro, David Dambro's brother. MLG provided DIA with "leads" or lists of investors who could be contacted by DIA's sales representatives. MLG also produced and distributed the written information about IIAP which was sent to potential investors.

Vickery was aware of the agreement between IIAP and DIA pursuant to which DIA would receive 60% of the funds it raised on behalf of IIAP. These monies were earmarked for sales commissions, operations, and consulting expenses. There was no written agreement concerning the 60% to be paid to DIA. Vickery was also aware that the maximum that DIA was to raise for IIAP was $6 million.

All of the $6 million raised for IIAP was initially deposited in DIA's bank account. In March, 1995, the accounting firm of BDO Seidman prepared a summary showing how the $6 million was disbursed from IIAP's inception, in April, 1994, through December 31, 1994 [Plaintiff's Exhibit 5]. The BDO Seidman accounting shows that $2.4 million dollars was paid to "Perry West, Trustee." This reflects the $2.4 million "escrow account" that was for the benefit of IIAP. A total of $3,561,729.94 was disbursed to various categories of IIAP/DIA expenses. Out of this nearly $3.6 million, MLG received transfers of $325,941.91, out of a total of $328,560.18 spent for "advertising and promotion." DIA received $882,665.03 and MDG received $569,319.99 out of a total of $1,620,981.58 spent for "consulting fees." Other operating expenses of IIAP and/or DIA, for items like equipment rental, office supplies, postage, rent, telephone, and legal fees, were paid. A small amount, $38,270.06, was left after the $2.4 million escrow and nearly $3.6 million in other

disbursements were subtracted from the $6 million raised. This $38,000 was transferred to the IIAP Operating Account.

In July, 1994, IIAP, through Anneke, purchased three interactive television licenses at an FCC auction for the total cost of $6 million. IIAP paid the $1.2 million down payment to the FCC from the $2.4 million "escrow account." After paying the nearly $3.6 million in operating expenses, commissions, and consulting fees to and through DIA, and after paying $1.2 million for the down payment on the licenses, IIAP was left with insufficient funds with which to make the remaining payments to the FCC or to acquire and build out the necessary equipment and infrastructure to operate the interactive television systems authorized by the FCC licenses. In fact, no interactive television system was ever built by IIAP.

## DISCUSSION

### A. The Debt

An important first step in the analysis of Plaintiff's claims in this adversary proceeding is to clarify just what the debt he seeks to have determined nondischargeable is, and what it is not. The debt is the IIAP Judgment against Vickery and in favor of Plaintiff. Plaintiff, as Trustee for IIAP's bankruptcy estate, is the creditor whose debt is at issue. Vickery's liability on the IIAP Judgment arises from Vickery's participation in the transfer of assets from IIAP to DIA and others. The debt at issue in this adversary proceeding is not a debt based on Vickery's role in obtaining IIAP funds from the investors who were contacted by DIA's salespeople. Thus, for example, any securities laws violations that occurred in the marketing of IIAP partnership interests, and any misrepresentations or failures to disclose facts about IIAP to the investors are irrelevant to this case. Plaintiff's debt is related only to what happened to IIAP's assets after the funds were obtained from the investors. It has nothing to do with how the funds were raised from the investors in the first place. The Court mentions this point at the start of its analysis because the presentation of this case was unnecessarily complicated and unfocused due to the parties' tendency to conflate exactly what the alleged non-dischargeable debt at issue is, and to whom the debt is owed.

### B. Preclusion

The implications of the doctrine of issue preclusion (or collateral estoppel) in this case have been extensively discussed by the Court in its prior orders denying Plaintiff's motion for summary judgment and denying Plaintiff's request for reconsideration and/or Plaintiff's renewed motion for summary judgment. The Court found, for reasons stated in those orders, that not all of the elements of Plaintiff's non-dischargeablility claims were necessarily decided in the IIAP Adversary Proceeding.

That does not mean, however, that the judgment from the IIAP Adversary Proceeding has no preclusive effect in this case. Claim preclusion (or *res judicata*) applies to preclude any claim by Vickery which would challenge the extent or validity of the underlying debt he owes Plaintiff. *Clark v. Zwanziger (In re Zwanziger)*, 467 B.R. 475, 481 (10th Cir. BAP 2012). Identical issues that were necessarily decided in the IIAP Adversary Proceeding are binding, through the doctrine of issue

preclusion (or collateral estoppel), in this case. The jury's determination that Vickery participated in a conspiracy to cause IIAP to make fraudulent transfers, for example, was necessary to the Court's judgment imposing liability on Vickery for all of the transfers made to the co-conspirators, and is therefore preclusive. Similarly, it was necessarily decided in the IIAP Adversary Proceeding that the total amount of property fraudulently transferred by IIAP was $3.6 million.

Accordingly, the Court must analyze whether the issues established through the application of preclusion principles, plus the additional evidence presented at trial, establish all of the elements of Plaintiff's claims under 11 U.S.C. §§ 523(a)(2), (4), or (6).

### C. Plaintiff's § 523(a)(2) Claim

In its prior rulings in this case, the Court has rejected Plaintiff's claim that the IIAP Judgment for funds transferred "with the intent to hinder, delay, or defraud" creditors of IIAP is a debt for "false representations, or actual fraud," under 11 U.S.C. § 523(a)(2)(A) without proof of the following elements: (1) the debtor made a false representation; (2) with the intent to deceive plaintiff; (3) plaintiff relied on that representation; (4) the reliance was reasonable; and (5) that the misrepresentation caused the creditor to sustain a loss. See, *Fowler Bros v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996). The Court also ruled that a claim for "false pretenses" under this section requires proof that the debtor created and fostered in the creditor a false or misleading understanding of the transaction. *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part and rev'd in part on other grounds*, 146 B.R. 269 (D. Colo. 1992).

Plaintiff endeavored to fit the evidence he presented at trial into the *Young* elements by arguing that Vickery misled IIAP by failing to disclose that only $2.4 million of the $6 million raised would be available to IIAP for the acquisition of FCC licenses and the build out of the technology necessary to operate an interactive television system. The evidence was to the contrary. The evidence showed that the principals involved in IIAP, including Dambro and Anneke, IIAP's initial general partner, were well aware of, in fact created, the fund-raising and expense parameters. There was nothing in this regard that was concealed from IIAP, and there were no misrepresentations on which IIAP reasonably relied. Accordingly, Plaintiff's § 523(a)(2)(A) claim fails, and the Court will enter judgment in favor of Vickery on this claim.

### D. Plaintiff's § 523(a)(4) Claim

Plaintiff's § 523(a)(4) claim, as set out in his Complaint, was solely based on the "fiduciary fraud" prong of § 523(a)(4). A claim for fraud or defalcation while acting in a fiduciary capacity under § 523(a)(4) requires proof that money or property was entrusted to the debtor as trustee of an express or statutory trust, and that the debt at issue resulted from the debtor's fraud or defalcation while acting as the fiduciary of the trust. *Young*, 91 F.3d at 1371-73. Plaintiff failed to establish that the $3.6 million, the transfer of which formed the basis for the IIAP Judgment, constituted the *res* of an express or statutory trust for the benefit of IIAP. Plaintiff cannot succeed on this claim.

Perhaps recognizing this, Plaintiff asserted at final argument that he pled a claim under the

embezzlement prong of § 523(a)(4) in his Complaint. This is simply not true–the Complaint contains no reference whatsoever to embezzlement. Plaintiff alluded to an "amendment" to the pleadings by virtue of his use of the embezzlement theory in his motion for summary judgment. However, Plaintiff never moved to conform the pleadings to the evidence on this issue. Vickery has never been given fair warning that he must defend a § 523(a)(4) claim on the basis of embezzlement.

### E. Plaintiff's § 523(a)(6) Claim

Under § 523(a)(6), a debtor is denied discharge from liabilities arising out of "willful and malicious injury" by the debtor to another or another's property. For a debt to become nondischargeable under § 523(a)(6), the debtor "must desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (quotation omitted). Whether the "willful and malicious injury" exception to dischargeability in § 523(a)(6) applies "turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur." *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, 2000 WL 1275614 at *3 (10th Cir. 2000) (unpublished opinion).

As discussed in the Court's previous orders on Plaintiff's motion for summary judgment, the § 523(a)(6) claim requires the Court to focus on Vickery's personal actions and intentions. In this way, § 523(a)(6) is different from § 523(a)(2) or § 523(a)(4), both of which focus on the nature of the underlying debt, not the nature of the debtor's conduct. Plaintiff can succeed on his § 523(a)(6) claim by proving that Vickery intended IIAP to suffer an injury as the consequence of his actions, or that he believed that injury to IIAP was substantially certain to occur as a result of his actions.

Based on the evidence at trial, the Court finds that Vickery was a knowledgeable and willing participant in Dambro, Mallach and Anneke's plan to raise $6 million for IIAP and to transfer $3.6 million to Dambro, Mallach, Vickery, Michael Dambro, and their related entities. The evidence also showed that Vickery took intentional actions to further this plan, and that he acted with knowledge that the transfer of $3.6 million by IIAP to himself and the other defendants in the IIAP Adversary Proceeding was certain to injure IIAP by depriving IIAP of funds to which it was entitled. The Court finds that Vickery knew and intended that the transferees of the $3.6 million were receiving more than they were entitled to receive based on the services they provided to IIAP. The IIAP Judgment is the result of these intentional actions and injury to IIAP by Vickery and his co-conspirators. The IIAP Judgment is therefore non-dischargeable under 11 U.S.C. § 523(a)(6).

### CONCLUSION

Based on the foregoing, it is

ORDERED that the IIAP Judgment is not a debt for false representations, false pretenses, or actual fraud under 11 U.S.C. § 523(a)(2), and judgment will enter in favor of Vickery on Plaintiff's First Claim for Relief;

FURTHER ORDERED that the IIAP Judgment is not a debt for fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4), and judgment will enter in favor of Vickery on Plaintiff's Second Claim for Relief; and

FURTHER ORDERED that the IIAP Judgment is a debt for willful and malicious injury by Vickery to IIAP, and judgment will enter in favor of Plaintiff and against Vickery, declaring the IIAP Judgment, in the amount of $4.6 million in actual and punitive damages, plus pre-petition interest of $865,272.48, for a total amount of $5,465,272.48, is non-dischargeable in Vickery's bankruptcy case, pursuant to 11 U.S.C. § 523(a)(6).

DATED: June 5, 2012

BY THE COURT:

A. Bruce Campbell
United States Bankruptcy Judge